IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |
|---|---|
| MICHAEL RUNNELS *et al.*, )<br>)<br>*Plaintiffs*, )<br>)<br>v. )<br>)<br>NORCOLD, INC., *et al.*, )<br>)<br>*Defendants*. )<br>)<br>) | Civil No. 1:16-cv-713<br><br>Hon. Liam O'Grady |

## MEMORANDUM OPINION

This case arises out of a fire that began in the refrigerator of Michael and Donna Runnels's (the "Runnelses") Winnebago. The fire then spread to their nearby house and garage, and as a result, the Runnelses lost most of their possessions. Mr. Runnels was injured while trying to save his possessions from the fire. Brian Colbert, a sheriff's deputy and volunteer fireman who arrived at the scene, was also injured. Mr. Colbert and the Runnels ("Plaintiffs") brought suit against the refrigerator manufacturer, Norcold, Inc. and its corporate affiliates, Thetford Corporation and The Dyson-Kissner Moran Corporation (collectively "Defendants") (without Norcold, the "Corporate Defendants"). On February 23, 2017, however, the parties notified the Court that they had settled all of the Runnelses' claims. This leaves only Mr. Colbert's claims.[1]

Prior to the settlement, Defendants moved for summary judgment on the application of the Fireman's Rule to Mr. Colbert's claims. (Dkt. No. 119). The Corporate Defendants have

---

[1] The parties agree that Mr. Colbert cannot assert a negligence claim because his position as a deputy police officer precludes him from recovering for ordinary negligence. Mr. Colbert continues to assert claims for a breach of the implied warranty of merchantability and for willful and wanton conduct.

1

separately moved for summary judgment based on their limited liability. (Dkt. No. 125).

Plaintiff Colbert has moved for summary judgment on all of Defendants' affirmative defenses.

(Dkt. No. 129). The Court held oral argument on Friday, February 24, 2017 and **GRANTED**

Defendants' motion for summary judgment on March 3, 2017. This Memorandum Opinion

details the reasons for that decision.

## I. BACKGROUND

In December 2006, the Runnelses bought a Winnebago Adventurer Recreational Vehicle

(the "RV"), which they used regularly throughout the time they owned it. The RV came with a

Norcold 1200 Series gas absorption refrigerator. On August 2, 2015, Mr. Runnels turned on the

refrigerator in preparation for a trip. He then left the RV and returned to his home. Shortly

thereafter, he saw smoke coming from the RV. He rushed to the RV and saw flames coming

from the refrigerator when he opened the door. The fire spread, and ultimately consumed the

RV, the Runnelses' home, and their garage. Most of the Runnelses' possessions were destroyed

in the fire.

Mr. Colbert is a volunteer firefighter and a sheriff's deputy with the Fauquier County

Sheriff's Office. Mr. Colbert received at least 18 weeks of response training for his job as a

deputy and had previously received training specific to responding to fires in his capacity as a

volunteer fireman. Colbert Depo. 17:3–18:15 (Dkt. No. 120-6). Mr. Colbert had experience

fighting fires "all over the county" and understood the risks associated with fires, including the

risks of explosions. *Id.* at 18:15–20:15. In this case, Mr. Colbert responded to the fire, and while

on the scene was struck by a piece of shrapnel. The shrapnel hit Mr. Colbert in the arm and

injured him.

The refrigerator at issue was designed, manufactured, and marketed by Norcold. Norcold is owned by Thetford, which is in turn owned by DKM. Michael Harris is the director of Norcold and is on the board of directors at DKM. He was deposed as the corporate representative for both DKM and Thetford. Mr. Harris also sits on the incident review committee meetings where Norcold discusses claims against it.

Before diving into the details of the recalls at issue in this case, it is helpful to understand how a gas absorption refrigerator works. The refrigerator has a cooling unit that operates by heating a solution of ammonia, water, and cromate until that solution evaporates into vapor. The vapor is condensed in the rectifier, which separates the liquid ammonia and water. The liquid ammonia is then released. Because its boiling point is very low (-28.01°F), the ammonia evaporates almost immediately. Hydrogen is added to the system in order to lower the partial pressure of the gas, which in turn lowers the boiling point further so that the solution's temperature remains below the internal temperature of the refrigerator. The ammonia's evaporation has a cooling effect on the inside of the refrigerator because the ammonia absorbs heat as it evaporates. The ammonia gas is captured by a device that mixes the ammonia with water again, and the cycle repeats. The whole process is initiated by applying heat to the outside of the boiler tube of the cooling unit.

In this system, the solution of water and ammonia is corrosive and can erode the steel tubing used for the cooling unit. If enough corrosion occurs, it can create a leak in the steel boiler area. When this happens, the cooling liquid can leak out of the tubing. At this point, the hydrogen gas may also leak out of the tubing. Hydrogen is a highly flammable gas, and could be ignited once exposed to external elements. Norcold admits that this feature—"fatigue failure of corrosion in the boiler tube of the refrigerator that leaks hydrogen gas"—is a product defect.

3

Klein Depo. 28:7–10 (Dkt. No. 130-4). It appears, however, that corrosion is impossible to control completely in this sort of gas absorption refrigerator, and Plaintiff has not produced any evidence of a commercially available absorption refrigerator that has completely negated the problem of corrosion. *See* Keifer Depo. 153:18-22 (Dkt. No. 120-9).

Defendants have undertaken a number of steps in response to the fires in its refrigerators. Though these steps are recounted in numerous evidentiary sources, the general timeline is summarized in a report from Applications Engineering Group, Inc. ("AEGI"), that was commissioned to:

> [R]eview a fire investigation which involved a Norcold refrigerator and determine if the Norcold refrigerator exhibited the characteristics of a common defect (corrosion causing a leak in the boiler). Further, if the propensity of their refrigerators to produce fires due to the defect was well known to Norcold and determine if Norcold has sufficiently addressed the common defect to prevent further refrigerator caused fires.

Keifer Rep. at 1 (Dkt. No. 120-7). Orion P. Keifer, a well-qualified engineer, conducted the investigation and was responsible for the AEGI report. *Id.*

Among other observations and analysis, Mr. Keifer came to the following conclusions: (1) Norcold has known that their cooling units have been leaking flammable gases from the boiler area since 1999, and fires in the 1200 Series have been occurring since 2001; (2) Norcold has known that the 1200 Series specifically has suffered leakage due to boiler corrosion since at least 2005[2]; (3) except for a minor change in a "heater pocket weld" in 2001, Norcold did not change the design of the 1200 Series boiler tubes until 2012, even though such changes were necessary to "address the root cause of the Norcold refrigerator failures . . . and subsequent

---

[2] This conclusion is explicitly contested in the Klein Affidavit, which states that, "[d]uring the time period in which this testing was conducted [in September 2005], Norcold had not determined that corrosion was the root cause of the failure in the boiler tube." Klein Affidavit at 10 (Dkt. No. 123). Plaintiff disputes the admissibility of the Klein affidavit, however the evidence in that affidavit is not necessary to the Court's decision, and therefore the motion to strike is not addressed here.

fires"; (4) Norcold implemented a series of "fixes" that were designed to remove ignition sources, but these fixes did not address the corrosion itself or the possibility of external ignition sources; (5) Norcold finally addressed the "root cause" in 2012 when it redesigned its refrigerators, however, it did not inform its customers of the safer design and instead stated that the design was intended to improve cooling rather than address safety issues; and (6) the design changes show that a safer design was feasible and was "based on concepts, materials and designs that have been readily available in the marketplace since at least by [sic] 2000." *Id.* at 1–3.

Without dwelling too much on the details of the report, it is also worth noting some of the additional action that Norcold has taken in response to the fires in its refrigerators. First, Norcold has taken various steps to monitor and address the issues of fires since it first discovered the cooling unit leaks. *Id.* at 7. It has commissioned 10 separate studies on the causes of the leaks and the best way to redesign the boiler tubes. *Id.* These include studies from the Edison Welding Institute ("EWI") and the University of Dayton Research Institute ("UDRI"). *Id.* Norcold has also kept an "incident log" that has recorded more than 2,900 claims specific to the 1200 Series since 2001. *Id.* at 8. Additionally, Norcold maintains incident files for each fire claim, and has investigated many of the claims. *Id.*

In addition, Norcold has issued seven product safety recalls and retrofit campaigns as a result of customer complaints that it received.[3] *Id.* These campaigns were conducted in four phases. The first set of recalls was directed at the N6 and N8 models and replaced the cooling and heating units of the refrigerators. *Id.* Next, Norcold recalled early model 1200 Series (those made in 1996-97) to address a similar problem. *Id.* at 10. The third wave of recalls retrofitted all early model refrigerators with a Thermal Safety Switch ("TSS") that was designed to detect high

---

[3] These are: NHTSA No. 02E-045 (2002); NHTSA No. 08E-030 (2008); NHTSA Nos. 09E-026 and 09E-027 (2009), and NHTSA No. 10E-049 (2010). *Id.* at 7–8.

temperatures in the refrigerator cabinet and shut off power before a fire occurred. *Id.* The Runnelses' refrigerator was not included in this recall because it was a later model that had an algorithm that Norcold believed would perform the same function as the TSS. *Id.*

Finally, on October 7, 2010, Norcold issued NHTSA Recall No. 10E-049, which included all 1200 Series refrigerators. *Id.* at 10; Defs. Opp'n, Ex. 14 (Dkt. No. 152-14) (October Recall Letter). The purpose of the recall was to retrofit the refrigerators with a high temperature sensor ("HTS") that would monitor the boiler area for high temperatures and detect them faster than the TSS. Keifer Rep. at 11. When the HTS was triggered, it would shut off the refrigerator's power before a thermal event in the boiler tube could occur. *Id.* It is undisputed that the HTS does not rule out the possibility of hydrogen being ignited from sources other than the refrigerator. Defs. Opp'n at 18. Mr. Keifer therefore concludes that all of these recalls were imperfect solutions to the problem, which he argues should have addressed the corrosion issues in the cooling unit rather than simply removing an ignition source. Keifer Rep. at 11. There are, however, no allegations that an alternative ignition source caused the fire in this case, and it does not appear that any such instance has ever been documented.

Thetford and DKM admit that there have been fires reported since the HTS was installed and that the HTS does not necessarily stop fires from occurring.[4] Pls. MSJ ¶ 12; Roberts Depo. 45:19-25, 49:1-7, 51:17–53:1 (Dkt. No. 147-6); Harris Depo. 120:20–121:8 (Dkt. No. 147-7). Specifically, Defendants admit that they "were conscious and knew in 2010 when they issued the HTS recall that the recall would not stop the corrosion and leaking of highly flammable gas in Norcold refrigerators." Klein Depo at 90:13-19 (Dkt. No. 130-4). At that time, Defendants had received a number of recommendations regarding ways to prevent the cause of the defect, such

---

[4] Defendants contest this fact to the extent it suggests that the HTS is ineffective. *See* Ross Rep. at 2 (Dkt. No. 147-13).

as thicker boiler tubes and stronger metal; however, Norcold did not implement these changes in the recall. It did implement the changes in the newly-designed 1200 Series refrigerators produced after 2012. Existing customers were not notified of this change in design. Nor were they offered the opportunity to substitute their old model refrigerators for the newer and safer post-2012 1200 Series. Keifer Rep. at 11.

In October 2010, two days after receiving the recall notice, Mr. Runnels brought his refrigerator in to be fitted with the HTS. The recall kit was installed by a company called Restless Wheels in Virginia. Keifer Rep. at 12. After the installation, the Runnelses did not experience any issues with their RV or their refrigerator until 2015.

In May 2015, the Runnelses took their RV to a race in Talladega. During this trip, the refrigerator stopped cooling, and Mr. Runnels called a technician who stated that he worked on Norcold refrigerators. The technician replaced a fuse in the refrigerator. Thereafter, the refrigerator functioned without issues until the fire on August 2, 2015.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the initial burden of showing the court the basis for its motion and identifying the evidence that demonstrates the absence of a genuine issue of material fact. *Id.* Once the moving party satisfies its initial burden, the opposing party has the

burden of showing, by means of affidavits or other verified evidence, that there exists a genuine dispute of material fact. *See Matushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986); *see also Local Union 7107 v. Clinchfield Coal Co.,* 124 F.3d 639, 640 (4th Cir. 1997) ("To avoid summary judgment, the non-moving party's evidence must be of sufficient quantity as to establish a *genuine* issue of material fact for trial.") (emphasis in original). A dispute of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,255 (1986)). However, "[f]anciful inferences and bald speculations of the sort no rational trier of fact could draw or engage in at trial need not be drawn or engaged in at summary judgment." *Clinchfield Coal Co.,* 124 F.3d at 640. To defeat a summary judgment motion, the existence of specific material evidentiary facts must be shown. *Ash v. United Parcel Service, Inc.,* 800 F.2d 409, 411–412 (4th Cir. 1986).

### III. DISCUSSION

Mr. Colbert is the only remaining plaintiff in this case. His claims are (1) a breach of the implied warranty of merchantability, and (2) willful and wanton conduct that amounts to an intentional tort and gives rise to exemplary damages under Virginia law. Defendants raised fourteen affirmative defenses in response.

With the Runnelses out of the case, the issues before the Court can be distilled to the following legal question: Is Mr. Colbert eligible to recover from Defendants notwithstanding Virginia's Fireman's Rule? The answer to that question turns on whether Defendants' actions rise to the level of "willful or wanton" conduct. Because Defendants' conduct does not meet this high standard, Virginia's Fireman's Rule bars Mr. Colbert's recovery.

## A.   Virginia's Fireman Rule

The Fireman's Rule is a common law rule that eliminates a defendant's liability for negligent conduct that injures certain public officials performing their duties. *Hudgins v. Holman*, 49 Va. Cir. 279, at *2 (1999). In other words, police officers, firemen, and other public officials that engage in high-risk activities may not recover for a defendant's negligence, even though other members of the community might be able to do so. *Id.* In 1968, the rule was formally adopted by the Virginia Supreme Court. *See Chesapeake & O. Ry. Co. v. Crouch*, 208 Va. 602, 606–07 (1968). In *Chesapeake*, the court explained that the Fireman's Rule rests on well-established principles of assumption of risk:

> It is well known that there is negligence present in the origin of many, if not most, fires, and that there is a potential danger inherent in all. In responding to an alarm, the fireman necessarily is aware that fire is in progress and the usual hazards are apt to exist; yet his duty so to respond is unaffected by the fact that the fire may have been created by negligence. If injured while encountering the ordinary hazards his duty requires him to confront, it is immaterial that the fire was negligently set.

*Id.* at 608. In future cases, the Virginia Supreme Court also noted that (1) firefighters and police officers are compensated through worker's compensation programs and need not rely as heavily on tort law to address their injuries; and (2) firefighters and police officers often enter premises at unforeseeable times and into areas not open to the public. *Benefiel v. Walker*, 244 Va. 488, 422 (1992). Shortly after *Benefiel*, the Virginia Legislature enacted Virginia Code § 8.01-226, which codified the Fireman's Rule.[5]

## B.   The Willful and Wanton Negligence Exception

As with many common law rules, the Fireman's Rule has exceptions. Specifically, the Virginia Supreme Court has explicitly held that "the Fireman's Rule is inapplicable to intentional

---

[5] The court in *Hudgins* explored some of the nuances in the codified version of the law. *Hudgins*, 49 Va. Cir. 279, at *3–4. None of these amendments to the Rule are relevant for the purposes of this case. *See Greene v. Consol. Freightways Corp. of Delaware*, 74 F. Supp. 2d 616, 622 (E.D. Va. 1999).

torts." *Goodwin v. Hare*, 246 Va. 402, 405 (1993). In other words, in order to hold a defendant

liable for a fireman's injuries, the plaintiff-fireman must show at least willful or wanton conduct.

*Greene v. Consol. Freightways Corp. of Delaware*, 74 F. Supp. 2d 616, 622 (E.D. Va. 1999),

*aff'd*, 2 F. App'x 299 (4th Cir. 2001); *Hudgins*, 49 Va. Cir. 279, at \*2.

In this case, the parties do not dispute that Mr. Colbert is a public official who cannot

recover for ordinary negligence. Indeed, based on his experience and training as both a

volunteer fireman and a deputy officer, this cannot reasonably be contested. *See generally*

Colbert Depo. at 19 (Dkt. No. 120-6). The remaining dispute therefore centers on whether

Defendants' actions rose to the level of willful and wanton conduct.

"Whether an action rises to a level deemed willful or wanton is largely a fact-specific

inquiry, and each defendant's actions or omissions must be individually evaluated." *Sawyer v.

C.L. Pincus, Jr. & Co.*, 83 Va. Cir. 251 (2011). "The difference between conduct, which can be

legally characterized as willful and wanton, and conduct, which can be characterized as legally

negligent lies in the state of mind of the tortfeasor." *Hudgins*, 49 Va. Cir. 279, at \*7. In other

words,"[w]illful and wanton negligence is action undertaken in conscious disregard of another's

rights, or with reckless indifference to consequences with the defendant aware, from his

knowledge of existing circumstances and conditions, that his conduct probably would cause

injury to another." *Woods v. Mendez*, 265 Va. 68, 76–77 (2003).

On the other hand, evidence of "ill will" is not necessary to show willful or wanton

conduct. *Alfonso v. Robinson*, 257 Va. 540, 545 (1999). Rather, in order to establish willful or

wanton negligence, the defendant must have been actively or constructively aware of the danger

involved. *Fravel v. Ford Motor Co.*, 973 F. Supp. 2d 651, 655 (W.D. Va. 2013) (applying

Virginia law). As such, "prior knowledge or notice that [a defendant's] actions or omissions

would likely cause injury to others is a significant factor in considering issues of willful and wanton negligence." *Alfonso*, 257 Va. at 546 (affirming a jury instruction on the question of willful and wanton negligence where plaintiff struck a truck that defendant had left disabled and without hazard lights on the highway for 10–15 minutes in a busy portion of the road with poor lighting and a speed limit of 55 m.p.h.).

The court in *Hudgins* did an excellent job of exploring the issue of willful and wanton conduct as it relates to the Fireman's Rule, and that case guides the Court's decision here. *Hudgins*, 49 Va. Cir. 279, at *1. In *Hudgins*, defendants were an electric company and its employees. *Id.* The employees were on duty and performing work that required a bucket lift to reach a rooftop that required their attention. *Id.* After descending from the roof, the employees did not properly secure the bucket lift. *Id.* While driving from the work scene, the lift stuck a power line. *Id.* That incident caused a fire in a neighboring auto body shop. *Id.* Two local firemen were killed while responding to the blaze. *Id.* at *2. Thereafter, the firemen's families brought suit against the power company. *Id.*

In arguing that the defendants' conduct rose to the level of willful and wanton acts, plaintiffs focused on defendants' knowledge of the danger, specifically that the power company was "on notice that such aerial lift accidents were foreseeable." *Id.* at *7. In support of this assertion, plaintiffs noted that defendants affixed warnings to its vehicles in response to the operating dangers and the previous incidents. *Id.* They further pointed out that the power company had "failed to implement a recommendation by an internal safety committee to install pressure-activated plates and/or switches to prevent operation of the vehicle unless the aerial lif[t] was secured. *Id.* Plaintiffs therefore argued that defendants' knowledge of a better solution pushed the case into the category of willful or wanton conduct.

11

The court disagreed. It wrote:

> The mere fact that such a committee was convened lends credence to the concept
> that defendant Virginia Power Company was not recklessly ignoring the problem.
> While the recommendations of the internal committee were not followed, the
> existence of the committee proves that Virginia Power was aware of the problem
> and investigating solutions. It could be argued that failure to follow the
> recommendations of the internal committee was negligent in that Virginia Power
> was inattentive to their recommendations or perhaps careless in not following the
> recommendations. However, it cannot fairly be said that not following the
> recommendations amounted to reckless disregard of rights of others. **Essential in
> any decision to implement new methods, operations, or products is the cost of
> those methods, operations, or products. This is not reckless disregard, but
> rather the standard manner of doing business in a free enterprise system.** If
> forced to totally disregard cost, in consideration of implementation of safety, a
> firm could be driven to expenditure of huge sums passed onto consumers in the
> form of increases in the price of goods.

*Id.* at *8 (emphasis added).

In making this finding, however, the court carved out another potential exception to its

rule. Specifically, the court in *Hudgins* further stated:

> It should be noted that in certain extreme circumstances, a court could sustain a
> finding of willful and wanton conduct for failure to implement safety items due to
> cost where the danger was terribly great and the cost to mitigate was modest and
> reasonable, or a company weighed the ultimate cost of litigation versus the cost of
> inattention (i.e., The Ford Pinto Case).

*Id.* at *8. "The Ford Pinto Case" refers to a 1981 California tort case in which the jury awarded

a staggering $125 million in punitive damages. In upholding a reduced award[6], the California

Appeals Court held:

> Through the results of the crash tests Ford knew that the Pinto's fuel tank and rear
> structure would expose consumers to serious injury or death in a 20 to 30 mile-
> per-hour collision. There was evidence that Ford could have corrected the
> hazardous design defects at minimal cost but decided to defer correction of the
> shortcomings by engaging in a cost-benefit analysis balancing human lives and
> limbs against corporate profits. Ford's institutional mentality was shown to be
> one of callous indifference to public safety.

---

[6] The plaintiff in that case was ultimately required to remit all but $3.5 million of the punitive damages award.
*Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757, 772, 174 (Ct. App. 1981).

*Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757, 772 (Ct. App. 1981). Thus, where a company is fully aware of a dangerous product defect and declines to take any steps to remedy that defect for financial reasons, punitive damages may be available. *See id.*

Though referenced frequently, this exception is rarely applied. By way of example, the Eighth Circuit explored the possibility of punitive damages for products liability in a case involving injuries caused by a vertical auger on a John Deere tractor. *Burke v. Deere & Co.*, 6 F.3d 497, 501 (8th Cir. 1993). In *Burke*, the defendant had received numerous complaints about users' auger-related injuries. *Id.* at 503. As a result, Deere instituted a "decal" program "whereby additional warning or caution decals were prepared and distributed to [the tractor] owners." *Id.* Thereafter, Deere also implemented a field-modification program that was designed to make the tractor safer. *Id.* at 506. On these facts, the Eighth Circuit reversed the trial court's decision to allow an instruction on punitive damages:

> [T]his scant evidence of an incidental economic benefit or monetary savings simply does not amount to the type of "calculated decision-making" required to justify an award of punitive damages. Specifically, there is no evidence that Deere considered and rejected a more costly field modification program when it decided to implement the decal program at a cost of $8,300 two years after the sale at issue in this case. The fact that a manufacturer undertakes a less costly alternative to remedy a perceived problem before moving to a more expensive recall program does not amount to willful or wanton conduct.

*Id.* at 512. In other words, the fact that a company considered the costs of its remedial plan does not necessarily mean that it acted willfully or wantonly in failing to implement the most effective program. *See id.* In sum, the corporate conduct at issue must be more than "merely objectionable" to rise to the level of wanton and willful negligence. *Id.*; *see also Ford Motor Co. v. Bartholomew*, 224 Va. 421, 437 (1982) (holding that no jury could find willful or wanton negligence when Ford investigated and considered alternative designs that displayed the word "Park" instead of "P" on the gear shift, but rejected them for logical reasons).

13

C.    **The Fireman's Rule Applies to Claims for Breach of the Implied Warranty of Merchantability.**

Plaintiff asks this Court to stretch the "willful and wanton conduct" exception much further. He cites *Greene* for the proposition that the Fireman's Rule might not apply at all in product liability cases. Pl.'s Opp'n at 20 (Dkt. No. 147). In *Greene*, a police officer sued when he when he fell off a truck and was injured in his efforts to arrest the driver of that truck. 74 F. Supp. 2d at 618. The court held that the Fireman's Rule applied in that case. *Id.* In doing so, it found that plaintiff's injuries were "caused solely" by his own actions, and there "was nothing negligent about the maintenance of the truck itself." *Id.* at 621. It went on to write that "[n]either the height, nor the manner or composition of the parts of the truck nor any action associated with [defendant's] activities had anything to do with the forcible removal of [the driver] from the truck." *Id.* Plaintiff extrapolates on this ruling to suggest that if there *had* been evidence of negligent design or maintenance, then the fireman rule would not apply. Pls. Opp'n at 20–21.

The relevant legal authorities do not support Plaintiff's argument. Although the Virginia Supreme Court has not explicitly held as much, analogous caselaw and sound logic both support the fact that the Fireman's Rule applies equally to breach of warranty or products liability claims. There are at least three reasons for this conclusion.

First of all, *Greene* itself does not reach this far. *See Greene*, 74 F. Supp. 2d at 622. Plaintiff's argument relies on the purest of dicta. Specifically, the court in *Greene* found that the Fireman's Rule *applied* to the officer's conduct. *Id.* As such, Plaintiff asks this Court to find an exception that has never been recognized in Virginia law. Moreover, "Virginia law has not adopted § 402A of the Restatement (Second) of Torts and does not permit tort recovery on a strict-liability theory in products-liability cases." *Sensenbrenner v. Rust, Orling & Neale,*

14

*Architects, Inc.*, 236 Va. 419, 424 n.4 (1988).  In light of Virginia's hesitance to adopt a strict

liability standard for products liability law, the Court concludes that a blanket "products liability"

exception to the Fireman's Rule should not be accepted where the plaintiff has failed to show

willful or wanton conduct.

Second, Virginia Code § 8.2–318 allows for plaintiffs to recover damages for breaches

of warranty only "if the plaintiff was a person whom the manufacturer or seller might reasonably

have expected to use, consume, or be affected by the goods."  Interpreting this statute, courts

have held that "[alt]hough Virginia law recognizes the limited existence of common law

warranties outside of the sales context, this court is unable to identify . . . any Virginia case

confirming the right of an injured party to maintain an action for breach of a common law

warranty absent *some* transaction to which he is a party or, at a minimum, a transacting party's

successor in interest or a foreseeable third-party beneficiary."  *Sutherlin v. Lowe's Home Centers,*

*LLC*, No. 3;14CV368 DJN, 2014 WL 4748530, at *3 (E.D. Va. Sept. 23, 2014) (emphasis in

original); *see also Buettner v. R.W. Martin & Sons, Inc.*, 47 F.3d 116, 118 (4th Cir. 1995)

(holding that "§ 8.2–318 does not create for the benefit of nonpurchasing users an independent

warranty of merchantability but rather simply preserves for remote users the warranties already

enjoyed by an immediate purchaser").

In light of this precedent, the Court concludes that Mr. Colbert falls outside the scope of

the class of permissible plaintiffs under Virginia Code § 8.2–318.  Mr. Colbert was not a user,

purchaser, or beneficiary of the Norcold refrigerator.  In fact, Mr. Colbert did not derive any

benefit whatsoever from the refrigerator and never engaged in any relevant commercial

interaction with Norcold.  Instead, Mr. Colbert arrived at the scene only after the refrigerator had

allegedly malfunctioned and caused the fire.  As such, Mr. Colbert did not interact with the

15

refrigerator as a consumer.  Rather, he interacted with the fire as a public official.  These facts place his claims firmly outside the class of commercial transactions contemplated by Virginia Code § 8.2–318.

Third, the great weight of the caselaw has concluded that the Fireman's Rule prevents plaintiffs from recovering on theories of negligence or strict liability in products liability cases.[7] In surveying state tort law, the Eleventh Circuit concluded that "[t]hese decisions share the assumption that, at a minimum, the Fireman's Rule will bar an action for strict products liability against a manufacturer whose product starts the fire that occasions the public safety officer's presence." *White v. Edmond*, 971 F. 2d 681, 688 (11th Cir. 1992).  In light of the rationale underlying the Fireman's Rule in the first place, this conclusion makes perfect sense.  *See Chesapeake*, 208 Va. at 606–07. Regardless what causes a fire, the fireman's job requires that he respond to that fire in order to promote public safety.  Indeed, even if the landowners wanted to, they could not prevent a fireman from battling or controlling the fire on their property. Moreover, "for that risk, the fireman should receive appropriate compensation from the public he serves, both in pay which reflects the hazard and in workmen's compensation benefits for the consequences of the inherent risks of the calling." *White*, 971 F. 2d at 687 (quoting cases that, in turn quoted *Krauth v. Geller*, 31 N.J. 270, 274 (1960)).  In other words, neither the fireman's assumption of risk nor his entitlement to worker's compensation is altered in any way by the fact that a fire may have been caused by a product's defect.  For these reasons, the Court concludes that Virginia law does not support an exception to the Fireman's Rule for products liability cases, except where wanton or willful conduct is present.

**D.**      **The Fireman's Rule Bars Recovery for Mr. Colbert**

---

[7] The one notable exception is the state of Illinois.  *See Court v. Grzelinski*, 72 Ill. 2d 141 (1978).

16

The parties' factual recitals in this case differ somewhat, though they both tell the same story.  Plaintiff's version of the history essentially has five portions, namely that Defendants: (1) knew of the defect as early as 1996; (2) received recommendations for better designs; (3) were aware that its remedies and recalls were not working and fires were still occurring; (4) did not change the refrigerators' design until 2012 in spite of these facts; and (5) did not notify its customers that a new design exited.  Defendants contest many aspects of these facts, but even taking them as true, it does not appear that they amount to a pattern of willful or wanton conduct that would preclude the application of the Fireman's Rule to Mr. Colbert's claims.

Plaintiff suggests that Defendants knew their recalls were not working.  The primary support for this contention is the fact that Norcold continued to receive complaints about fires after the recall.  Harris Depo. 114:5-8 (Dkt. No. 147-9).  In addition, Defendants admit that fires can potentially occur in Norcold refrigerators after an HTS has been perfectly installed and there was no bypass.  *Id.* at 113:6-9.  As further evidence, Plaintiff points out that the HTS does not prevent all fires from occurring; it simply removes the refrigerator itself as a potential spark.  In other words, the leaking hydrogen could still be ignited by electrical shorts, electrified particles, mechanical sparks, mechanical friction, mechanical vibrations, metaling fracture, hot surfaces, exhaust, and other sources.  Harris Depo. 62:1–63:25 (Dkt. No. 152-2).  Therefore, according to Plaintiff, the refrigerators are not safe as long as the defect in the tubing exists.  As such, Plaintiff argues that Norcold's failure to remedy these defects amounted to a conscious and reckless disregard for human life.

The Court finds that these facts do not satisfy Plaintiff's burden of showing willful or wanton conduct.  The cases and principles that Plaintiff cites for the proposition that a products defect can rise to the level of an intentional tort all have one thing in common: the defendants all

17

declined to act at all in response to a known danger. *See Fravel*, 973 F. Supp. 2d 651; *Alfonso*, 257 Va. at 546. By contrast, in products liability cases where defendants took some, but perhaps insufficient action, courts have consistently declined to find willful or wanton conduct. *See, e.g.*, *Bartholomew*, 224 Va. at 437.

It is worth repeating at this stage that the "Ford Pinto" standard is extremely high. *See Hudgins*, 49 Va. Cir. 279, at *7 (noting that it might apply in "extreme circumstances"). Plaintiff has not produced any "evidence that [Norcold] could have corrected the hazardous design defects at minimal cost but decided to defer correction of the shortcomings by engaging in a cost-benefit analysis balancing human lives and limbs against corporate profits." *Id.* To the contrary, the record shows that Norcold spent more than $30 million on an extensive recall and retrofit campaign, including $18 million on the 2010 recall that included the Runnelses' Series 1200 refrigerator. This campaign included seven separate recalls, and at least 10 commissioned studies to determine both the root cause of the problem and the best way to solve it. These studies indicated that Defendants were both testing and considering prototype models and various options as a remedy for the product defect. *See* Aug. 2010 Presentation at 7 (Dkt. No. 123-16). Defendants also implemented an incident log and established a committee to track each and every customer claim of boiler failures, leaks, fires, or other problems with their refrigerators. Keifer Rep. at 8. Therefore, instead of rising to the level of putting corporate profits above human life, this appears to be an example of the typical corporate decisionmaking involved in a calculated remedial process. *See Hudgins*, 49 Va. Cir. 279, at *8.

This brings the case well within the principles announced in *Hudgins* and *Burke*. In *Hudgins*, the power company had placed warnings on its bucket lift rather than installing a device that would forcefully prevent the truck from moving when the bucket was unsecured.

18

Similarly, in *Burke*, John Deere had instituted a recall campaign that installed decals on its tractors rather than implementing a field-modification plan in the first instance.  In both of those cases, safer alternatives were available to the companies, but were not immediately adopted, and yet the courts rejected the plaintiffs' "willful and wanton" arguments.  The facts here are analogous.

Nobody contends that Norcold simply stood by and paid out legal settlements instead of attempting to address the fire claims that it was receiving.  Nor has Plaintiff produced any internal documents to suggest an "institutional mentality . . . of callous indifference to public safety."  *Grimshaw*, 119 Cal. App. 3d at 772.  Instead, it appears that Norcold sought to limit the risks of fire by both redesigning its refrigerators and recalling them for retrofits.  Norcold had a series of alternative designs to choose from, but it is irrelevant that it did not implement some of them until 2012.  At the end of the day, the undisputed evidence shows that Norcold considered prototypes and made a series of calculated business decisions that reduced, even if it did not eliminate, the possible dangers of its products.  *See* Aug. 2010 Presentation (Dkt. No. 123-16).  This can hardly be classified as a "conscious disregard of another's rights."  *Woods v. Mendez*, 265 Va. 68, 76–77 (2003).  To hold otherwise would effectively place a burden on manufacturers to adopt all potential recall options, regardless of financial considerations and without a proper exploration of alternatives.  Quite simply, such a burden would offend "the standard manner of doing business in a free enterprise system."  *Hudgins*, 49 Va. Cir. 279, at *8.

This conclusion is underscored by the science of gas absorption refrigerators.  It is uncontested that no commercially-available gas absorption refrigerator is free from the problem of boiler tube corrosion.  *See* Keifer Depo. at 144:96-15 ("[E]verybody that's in this business is seeing this corrosion problem."); *id.* at 153:18-21 (stating he was unaware "of any production

gas absorption refrigerator that prevents corrosion"). Thus, contrary to Plaintiff's assertions, there is no evidence of any absolute "fix" that Norcold could have implemented in order to eliminate any risk of boiler leakage. As such, Norcold cannot be sure that the 2012 redesign will be effective.

In an attempt to rebut this conclusion, Plaintiff relies on the customer complaints and the incident log, noting that Norcold has not seen any evidence of fires in the refrigerators made after the 2012 redesign. Given the temporal dynamics of corrosion, however, that fact means very little. *See* Klein Depo. at 152:1-14. Corrosion occurs over time; indeed, it took more than 10 years for the alleged corrosion to take place in the Runnelses' refrigerator. *Id.* Even Mr. Keifer acknowledged that the 2012 design changes "only delay[] the problem, [they] doesn't prevent it." Keifer Depo. at 138:13–139:2. Therefore, it is entirely possible that the redesigned boiler will still corrode after a period of years. Only time will tell whether that is the case, but it is instructive that Norcold kept the HTS device in the redesigned refrigerators after 2012. That same fact counters Plaintiff's argument that Norcold should have warned its customers that a new model existed.[8] To emphasize this point, it is relevant that Norcold spent millions of dollars on a new design, and yet it still kept the "safety valve" (the HTS) that it had installed with the 10E-049 recall to prevent fires.

## IV. CONCLUSION

At the end of the day, Norcold may have been negligent in failing to more promptly address its refrigerators' defects until the 2012 redesign. With the Runnelses out of the case, however, negligence will no longer suffice, and Plaintiff has not met the high bar of "willful and

---

[8] Defendants argue that Plaintiff's failure to warn claim should be dismissed because it constitutes a separate cause of action under Virginia law, and that this cause of action was not pled in the complaint. *See* Defs. Reply in Supp. at 15-16 (Dkt. No. 154). Because the Fireman's Rule applies, however, the Court does not reach this argument.

wanton" conduct that would remove this case from the 50-year old precedent of the Fireman's Rule. *See Chesapeake & O. Ry. Co. v. Crouch*, 208 Va. 602, 606–07 (1968).

Therefore, for the foregoing reasons, the Court **GRANTED** Defendant's motion for Summary Judgment on the basis of the Fireman's Rule in its March 3, 2017 Order.

March ___, 2017
Alexandria, Virginia

Liam O'Grady
United States District Judge